Filed 10/7/14  P. v. Gomez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALVARO GOMEZ,<br><br>    Defendant and Appellant. | G048471<br><br>(Super. Ct. No. 12CF1430)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Francisco P. Briseno and Sheila F. Hanson, Judges.  Judgment affirmed.  Motion denied.

Donna L. Harris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lise Jacobson and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

Alvaro Gomez appeals from a judgment after a jury convicted him of two counts of possession of a firearm by a felon and possession of methamphetamine, and found true gang and prior felony conviction allegations. Gomez argues there was insufficient evidence supporting the gang enhancements, the trial court erred in admitting hearsay evidence, and the court erred in partially denying his motion for peace officer personnel records. Additionally, he filed a motion to augment the record and asks this court to independently review the peace officer personnel records the trial court reviewed. As we explain below, we deny his motion to augment. None of his contentions have merit, and we affirm the judgment.

FACTS

In response to a 911 call at 8:04 a.m., Officers Maria Orozco and Alejandro Partida responded to the area of an attempted robbery. About 8:16 a.m., the officers contacted Gomez, who matched the description of the perpetrator of the attempted robbery, and told him to lie on the ground. Gomez was wearing blue jeans and a black T-shirt that stated "'Famous Stars and Straps'" and had a right hand shaped in the letter "F." Gomez told the officers he had guns. Partida recovered a gun from Gomez's waistband and one from his pocket. Both guns were loaded with live rounds. Partida also found a bag of methamphetamine in Gomez's pocket. Officers arrested Gomez. Later, an officer searched Gomez at the Santa Ana Police Station and found a second bag of methamphetamine.

Orozco and Partida interviewed Gomez after advising him of his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Gomez described the claimed territory of the F-Troop criminal street gang and said its color was brown. Gomez said he grew up in F-Troop claimed territory, he "kicks it" or "kicks back" with F-Troop, his moniker is "Rookie," and he recently got "Trooper" tattooed on his left ring finger. Gomez said he got the guns from a man in the riverbed the prior week.

2

An amended information charged Gomez with two counts of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)[1] (counts 1 and 2)), and possession of a controlled substance, methamphetamine (Health and Saf. Code, § 11377, subd. (a)) (count 3). The information alleged Gomez committed counts 1 and 2 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that he was previously convicted of a felony (§§ 667, subds. (a)(1), (d) & (e)(1), 1170.12, subds. (b), (c)(1)).

Gomez and the prosecutor both filed pretrial motions. Gomez filed a motion for discovery of Orozco's and Partida's personnel records pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). Gomez sought records of their lack of credibility, falsification of police reports, prior acts of moral turpitude, prior law enforcement employment, and any material pursuant to *Brady v. Maryland* (1963) 373 U.S. 83. In his declaration supporting the motion, defense counsel stated Orozco and Partida arrested Gomez, they falsified their police report, and Orozco testified falsely at the preliminary hearing. The Santa Ana City Attorney opposed the motion.

At a hearing on Gomez's motion, the trial court, Judge Francisco P. Briseno, stated "*Pitchess* motions are usually done in measured steps[]" and indicated Gomez's motion was too broad and too general. The court said defense counsel could either refile the motion or the court could deny it and counsel could file a writ with this court. The court added it found one portion of the declaration potentially meritorious and stated "I'm just trying to help you." After the court discussed each of the categories of evidence Gomez sought, the prosecutor argued Partida's personnel file should not be reviewed in camera because he did not prepare the police report. The court indicated that if both parties were "comfortable" with modifying the motion to apply to just Orozco, the court would proceed. After an off-the-record discussion with counsel, the court on the record stated it had discussed the matter with counsel off the record and it would limit its

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

3

review to Orozco.  Defense counsel did not object.  After reviewing Orozco's personnel records in camera, the court ordered the release of contact information of three complaining civilian witnesses arising from one incident.

The prosecutor filed a trial brief that included among other things a motion to admit a transcript and recording of a 911 call from "Jose."  The prosecutor argued the evidence was relevant to prove the only contested issue at trial, the gang enhancement.  The prosecutor contended the evidence was admissible for the truth of the matter asserted as spontaneous statements (Evid. Code, § 1240) and for the non-hearsay purpose of establishing why officers stopped him and as a basis for the gang expert's testimony.  The prosecutor added admission of the evidence did not violate Gomez's confrontation rights pursuant to *Crawford v. Washington* (2003) 541 U.S. 36 (*Crawford*).

A five-page transcript of the call was included with the prosecutor's trial brief.  We include the complete call because it is relevant to issues on appeal.

"[Dispatch]:  9-1-1.  What is your emergency?

"[Dispatch 2]:  It's Station 10 with a transfer.  Go ahead Jose.

"Jose:  Hi, um, um, I, I was on Santa Clara street right now getting ready to go to work and, um, I was just [inaudible] and waiting and some guy tried robbing me right now.  He pulled out two handguns from his, from his pocket . . .

"[Dispatch]:  Santa Clara and what cross street?

"Jose:  Bristol.  He's on Bristol now walking.  He's got . . .

"[Dispatch]:  Okay.

"Jose:  . . . a black [inaudible] . . .

"[Dispatch]:  Were you in a car or were you on foot?

"Jose:  I was on foot.

"[Dispatch]:  Okay.

"Jose:  I was walking out from my house going to work and, uh, some guy just happened to be walking . . . I thought he was going to say "hi."  He pulls out two

4

guns and I didn't have nothing on me.  Somebody came out.  I don't know if he got spooked but he's walking down the street now . . .

"[Dispatch]:  Did he . . .

"Jose:  . . . and I'm trying to follow him . . .

"[Dispatch]:  Did he hit you or anything?  Did he take anything?

"Jose:  No.  No.  No.  He just approached me, took out two guns, asked me if I had anything and, uh, kinda [*sic*] spooked, got spooked when he saw that other person come out and, uh, I was walking down the street just [*sic*] want to make sure he doesn't hurt anybody.

"[Dispatch]:  Okay, so, he asked you if you had any money or what?

"Jose:  Yeah.  He asked me if I knew him, if, he just kind of hit me up.  I don't know if he was trying to find out if I was from a gang or something.  He . . .

"[Dispatch]:  Did he ask you where you're from?

"Jose:  Yeah.  Yeah he did.

"[Dispatch]:  Did he ask you for money or did he ask you . . . what did he ask you?

"Jose:  Oh he's like, he hit me up.  He's like "hey, where you from, you got anything?"  He said "you guys got me fucked up."  And I'm just "hey man I'm just here trying to go to work, cool down man I don't even know what the fuck's going on."

"[Dispatch]:  Okay.  And where are you from.  And which way is he walking?

"Jose:  He's walking down Bristol Street now about Memory Lane.

"[Dispatch]:  Which way?

"Jose:  Uh, um, I'm not, I'm not good on my direction but he's going towards Memory Lane right now.

"[Dispatch]:  Okay.  And for, did he have two guns?

"Jose:  Yeah.

5

"[Dispatch]: Where did he have them, in his pockets?

"Jose: Yeah. It looked like he had one in both hands. One in one, one in the other . . .

"[Dispatch]: Did he leave them in his hands?

"Jose: Yeah.

"[Dispatch]: Okay. And now he's walking like, towards Orange?

"Jose: Yeah. Down, down Bristol still, heading towards Memory Lane. He had a big logo on his shirt, on his black shirt. He had a red shirt on, it looks like he took it off.

"[Dispatch]: What race is he . . . white, black, Hispanic?

"Jose: He's Hispanic with about a high-top fade.

"[Dispatch]: A what? High top?

"Jose: A high fade.

"[Dispatch]: What do you mean?

"Jose: He's got a fade. [H]e's not bald. He's got a fade like he's got . . .

"[Dispatch]: Oh a hair, okay, short hair. Black hair?

"Jose: Uh, not short kinda [*sic*] long.

"[Dispatch]: Black hair. Okay.

"Jose: Not long, not long but it's like . . . yeah.

"[Dispatch]: Okay. Okay. And, um, how tall is he?

"Jose: Uh. He looks to be about 5'7, 5'6.

"[Dispatch]: Okay. And, um, what, uh, what about how old was he?

"Jose: Uh, you know what he looked pretty young. To tell you the truth I'm not sure about how young. Maybe . . .

"[Dispatch]: Eighteen, twenty?

"Jose: Nah. Seventeen, eighteen maybe.

6

"[Dispatch]: Seventeen, eighteen years. Okay. And what was he wearing. What color shirt?

"Jose: Uh, he was wearing a black shirt with a big, with a big logo . . .

"[Dispatch]: Black shirt?

"Jose: . . . in the middle of it . . . Yeah a black shirt. He had a red shirt on but it looks like he took it off. Now he's walking with a black shirt, with a black shirt with a big logo and blue jeans.

"[Dispatch]: Where's the logo at? Is it in the front or back?

"Jose: Middle of his shirt. Front.

"[Dispatch]: Did you know what the logo was?

"Jose: No. No.

"[Dispatch]: And he took off a red shirt you said or . . .

"Jose: Yeah.

"[Dispatch]: . . . sweater or?

"Jose: Yeah. A shirt.

"[Dispatch]: Is he holding it?

"Jose: Nah. It looks like he tossed it.

"[Dispatch]: Okay. And what color pants is he wearing?

"Jose: Blue jeans.

"[Dispatch]: No hat or anything right?

"Jose: Nah.

"[Dispatch]: Facial hair?

"Jose: Nah.

"[Dispatch]: Okay that tee, the black shirt, was it like a t-shirt type or button up shirt or what was it?

"Jose: It was a regular shirt. Ma'am do you guys really take this long, what if he would have shot me?

7

"[Dispatch]:  Yeah I'm already, as I'm talking to you the officers are already on their way.

"Jose:  Oh okay, okay.

"[Dispatch]:  Okay so where are you going to be so the officers can meet you?

"Jose:  Um, you know what?  I, I'm going to work.  I don't want that guy to see me.  Cause [*sic*] it looks he's seen me . . . it looks like he knew the area pretty well so, I mean, I got kids and my families [*sic*] are on there and I don't want any problems.  That's why I called you guys.

"[Dispatch]:  Okay.  So you don't want any contact with officers?  To . . .

"Jose:  No.

"[Dispatch]:  . . . make a report of it?

"Jose:  No I just want to make sure, I mean, I want to make sure you guys pick him up cause [*sic*] . . .

"[Dispatch]:  Well if we pick him up we can't charge him unless there's a victim.

"Jose:  Okay.

"[Dispatch]:  So we need you, I mean, we can probably stop him if we can and if he is armed them [*sic*] maybe they can do something with that but if you're a victim . . .

"Jose:  Yeah.  I mean that's what I want.  I know . . .

"[Dispatch]:  We're gonna [*sic*] need you to be a victim though?  We're not going to be able to charge him for attempt robbery if you're not there to be a witness.

"Jose:  I mean if you can't charge him for that then that's fine.  But if, I mean I know you guys will at least charge him for the guns.  If he has two guns on him and he's under age . . .

"[Dispatch]:  Okay.  What is your name?

"Jose: Jose.

"[Dispatch]: And your last name Jose?

"Jose: I'd rather not give it.

"[Dispatch]: Okay.

"Jose: But like I said I've had problems before and, and . . .

"[Dispatch]: Do you know him? Have you seen him before in the area?

"Jose: Uh, you know what no, I seen, I've never seen him but he looks like some of the younger kids that have been roaming around there causing trouble and you know this morning just to have a good wake, wake-up morning for me. You know, to wake up and see those two guns with a young punk I just don't want no problems. I'm sure that you guys will be able to charge him if they found them on him. He's not the legal age to have them.

"[Dispatch]: Okay, um, are you still walking or are you behind him?

"Jose: No. I'm driving. I'm driving. I, I, I drove, I drove to follow him as far as I could, I got on the, I got on the free . . .

"[Dispatch]: Oh you were . . .

"Jose: . . . [Y]eah, I got on the freeway and I'm headed towards work.

"[Dispatch]: Okay. Alright, um, I'll have the officers call you if they have any questions then okay?

"Jose: Okay.

"[Dispatch]: Alright. Bye-bye."

At a hearing on the prosecutor's motion, the recording of the call was played for the trial court. Gomez objected to admission of the transcript and recording of Jose's 911 call. Gomez argued the evidence was not relevant, was not a spontaneous statement, and violated his right to confront and cross-examine Jose. Gomez asserted the evidence was not relevant unless Jose testified Gomez was the man who confronted him. He stated the evidence was not admissible pursuant to Evidence Code section 1240

9

because Jose was in his car driving to work and his statements were thoughtful and reflective. He also claimed Jose apparently had another conversation with the first dispatcher and he had time to reflect. Finally, he contended the statements were testimonial because the dispatcher urged Jose to speak with police because they needed a victim. The prosecutor argued the evidence was relevant because of the near perfect description by Jose of what Gomez was wearing, the spontaneity of the statements must be considered based on the totality of the circumstances, and the statements were not testimonial.

After stating it was required to perform a multilevel analysis, the trial court ruled the 911 call was admissible because it was relevant, the statements were spontaneous, and the statements were non-testimonial. The court opined Jose was describing what he was observing and Jose was "still under the effects of the observations." The court stated the prosecution proved by a preponderance of the evidence the "911 call is a spontaneous statement and admissible under Evidence Code section 1240." After providing a lengthy discussion of the relevant federal and California authority, the court said Jose's statements did not have a level of formality or solemnity because Jose's statements were to assist law enforcement apprehend the individual and thus they were not testimonial. Finally, the court stated Jose's description accurately described Gomez's physical features, clothing, and weapons. The court concluded the 911 call was admissible because any undue prejudice did not substantially outweigh the evidence's probative value. During trial, the trial court overruled Gomez's objections to admission of the 911 call when the recording was played for the jury and denied his motion for mistrial.

At trial, the prosecutor offered the testimony of criminal street gang expert, Detective Armando Chacon. After detailing his background, training, and experience, Chacon testified concerning the culture and habits of traditional, turf-oriented Hispanic criminal street gangs. He explained the vital importance of respect within gangs. "The

10

more crimes you commit, the more illegal activities you commit, the more respect you're given within that group." He said earning respect is the only way a gang member rises through the ranks and achieves status in the gang. He said guns are extremely important because gang members use guns to commit crimes, intimidate the community, and disrespect rival gangs. Gomez stated F-Troop gang members express membership in the gang verbally and non-verbally. He said F-Troop gang members claim the gang non-verbally by wearing Famous Stars and Straps garb and by having F-Troop tattoos. He added gang members can drop out of gangs, but it is uncommon, and the former gang member would be punished for wearing the gang's symbols or colors or having a gang tattoo. He explained a "hit up" is when a gang member confronts someone and asks "'where are you from?'" to determine whether the person is in a gang. He said a gang member is "putting in work" when he commits crimes that benefit the gang. According to Chacon, possessing guns are examples of "putting in work" for the gang.

Chacon also testified concerning his significant experience investigating F-Troop. He testified that at the time of the incident F-Troop had about 50 members, its common signs or symbols were "F-T-R-O-O-P," "F-X-T, R-O-O-P," "Malditos," and "Trooper," its color was brown, and its rivals were all the gangs in the city but two. He said F-Troop gang members commonly wear the Famous Stars and Straps logo on hats, T-shirts, or sweatshirts because of the enlarged "F." He stated F-Troop's primary activities were robbery and various felony firearm offenses. He described F-Troop's claimed territory and stated F-Troop gang members have committed numerous crimes outside F-Troop claimed territory. He also testified concerning the predicate offenses, including Gomez's 2011 conviction for assault with a deadly weapon committed for the benefit of F-Troop. He said on another occasion, Gomez pleaded guilty to possessing a concealed firearm for the benefit of F-Troop. He opined F-Troop was a criminal street gang as statutorily defined. He also opined Gomez was a member of F-Troop at the time

11

of the offense based on the facts of the case, including Gomez's T-shirt and tattoo, and Gomez's criminal history.

In response to hypothetical questions based on the circumstances of the case, Chacon opined the offenses were committed for the benefit of and with the specific intent to promote the gang. Chacon explained a gang member earns respect by carrying a handgun and committing crimes. He added that when a gang member commits a crime alone, he does so "in the name of the group." He added the fact the gang member committed the crime adjacent to the gang's claimed territory indicates the gang member was trying to expand the gang's territory, which would also instill fear in rival gangs and in the community. He added the evidence showed the gang member "hit up" the victim and attempted to rob him. He said the gang member instilled fear in the victim, which prevented the victim from wanting to report the incident, and the gang member's and the gang's status was elevated.

On cross-examination, Chacon admitted Gomez's prior statements indicated he had not been "jumped in" F-Troop but that he grew up in the area. During Chacon's testimony, the trial court again overruled Gomez's objections to admission of the 911 call because the evidence was relevant to prove the gang enhancement.

At the close of the prosecutor's case-in-chief, Gomez moved to dismiss the gang enhancements as to counts 1 and 2 pursuant to section 1118. The trial court denied the motion concluding there was sufficient evidence to submit the matter to the jury.

Carmen Garcia, Gomez's aunt, testified for the defense. She stated Gomez lived with her in Anaheim at the time of the offense.

During closing argument, the prosecutor argued there was no real dispute Gomez committed counts 1, 2, and 3. He argued the only real dispute was the gang enhancements. The prosecutor argued the jury could find true the gang enhancements based solely on his possession of the guns while wearing gang clothing without relying on Gomez's confrontation of Jose.

12

Defense counsel invited the jury to hold Gomez accountable for his conduct but asserted the gang enhancements were based on assumptions. Gomez's defense was he did not possess the guns for the benefit of F-Troop but instead for self-defense and he was trying to leave F-Troop. The trial court properly instructed the jury on the gang enhancements, with CALCIM No. 1401, "Felony . . . Committed for Benefit of Criminal Street Gang."

The jury convicted Gomez of all counts and found true the enhancement allegations. After denying Gomez's motion to strike his prior conviction pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, the trial court sentenced Gomez to prison for 12 years as follows: count 1-four years plus a consecutive term of three years for the gang enhancement; and five years for the prior felony conviction. The court imposed and stayed sentence on count 2 pursuant to section 654, and imposed a concurrent sentence on count 3.

DISCUSSION

*I. Sufficiency of the Evidence*

Gomez contends insufficient evidence supports the jury's finding he committed counts 1 and 2 for the benefit of a criminal street gang. We disagree.

"'In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." [Citation.]' (*People v.*

13

*Albillar* (2010) 51 Cal.4th 47, 59-60 . . . (*Albillar*).)  The same test applies to the review of special circumstantial findings.  [Citation.]"  (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

"[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . ." by an additional term of years.  (§ 186.22, subd. (b)(1).)

In *Albillar, supra,* 51 Cal.4th at page 60, the California Supreme Court explained that although not every crime committed by gang members is related to a gang for purposes of the first prong, a crime can satisfy the first prong when it is committed for the benefit of a criminal street gang, at the direction of a criminal street gang, or in association with a criminal street gang.  The *Albillar* court also explained the second prong, which requires the defendant commit the gang-related felony "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1)), need not encompass proof the defendant committed the crime with the specific intent to promote, further, or assist other criminal conduct by gang members. Instead, that subdivision "encompasses the specific intent to promote, further, or assist in *any* criminal conduct by gang members—including the current offenses—and not merely *other* criminal conduct by gang members."  (*Albillar, supra,* 51 Cal.4th at p. 65.)

The *Albillar* court stated a gang expert's opinion is admissible *as part of* the evidentiary showing on how the crimes can benefit the gang.  (*Albillar, supra,* 51 Cal.4th at p. 63.)  "'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement.  (*Albillar, supra,* 51 Cal.4th at p. 63.)"  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

14

We conclude there was sufficient evidence, other than Chacon's testimony, from which the jury could reasonably conclude Gomez committed counts 1 and 2 for the benefit of F-Troop. Gomez "acknowledges" there was evidence at trial demonstrating he was a member or associate of F-Troop, and he does not dispute F-Troop was a criminal street gang as statutorily defined. The jury heard evidence Gomez had previously pleaded guilty to committing offenses for the benefit of F-Troop on at least two occasions. Additionally, F-Troop's primary activities included firearm offenses, and Gomez was prosecuted for two counts of possession of a firearm by a felon.

The evidence established that when officers stopped Gomez, he had two guns, he was wearing a T-shirt emblazoned with F-Troop's logo, and he had recently gotten an F-Troop tattoo. Chacon opined gang members who commit crimes alone do so "in the name of the gang." Chacon explained a gang member is "putting in work" when he commits crimes that benefit the gang, possessing guns are examples of "putting in work" for the gang, and guns are the primary tool for gangs to commit crimes, intimidate the community, and disrespect rival gangs. Chacon testified someone who was not a member of F-Troop would be punished for wearing clothing with the gang's logo or having a gang tattoo. Finally, when presented with a hypothetical question, Chacon opined the offenses were committed for the benefit of a gang because the gang member wore gang attire and possessed loaded guns to instill fear in the community and expand the gang's claimed territory. Based on the entire record, a rational trier of fact could have concluded beyond a reasonable doubt Gomez possessed the guns for the benefit of F-Troop.

There was also sufficient evidence from which the jury could reasonably conclude Gomez committed counts 1 and 2 with the required scienter—the specific intent to promote a criminal street gang. During his interview with officers, Gomez admitted he "kicks back" with F-Troop and he recently got "Trooper" tattooed on his finger. This evidence refutes Gomez's defense he was trying to leave the gang, and instead

15

demonstrates he was associated with and devoted to F-Troop. Again, the evidence demonstrated Gomez walked through an area adjacent to F-Troop claimed territory armed with two loaded guns, one of F-Troop's primary activities, and wearing clothing displaying F-Troop's logo. In response to a hypothetical question, Chacon opined that the possession of the firearms "assists in felony criminal conduct by members of F-Troop[]" because possession of guns facilitates criminal conduct and instills fear in the community and rival gangs. Based on the circumstances of the case, and Chacon's expert testimony, a rational trier of fact could reasonably conclude Gomez had the specific intent to promote any criminal conduct by gang members. (*Albillar, supra,* 51 Cal.4th at p. 65.)

*People v. Garcia* (2007) 153 Cal.App.4th 1499, is instructive. In that case, another panel of this court held sufficient evidence supported the jury's finding defendant carried a loaded unregistered weapon in public for the benefit of a criminal street gang, based on evidence that is not as strong as the evidence in this case. In that case, officers stopped defendant, an active gang member who had committed gang crimes, for a traffic violation and found the gun. (*Id.* at pp. 1502-1504.) Defendant contended he had been shot and he possessed the gun solely for self-defense. (*Id.* at p. 1512.) Based on the gang expert's testimony on the importance of guns in gangs and the respect gang members and gangs garner from possessing guns, the court held sufficient evidence supported the jury's finding on the street terrorism enhancement. (*Ibid*.) As we explain above, the record includes evidence from which the jury could reasonably conclude Gomez, an F-Troop associate who had a gang tattoo and wore gang clothing, possessed the guns for the benefit of and with the specific intent to promote F-Troop.

Gomez raises two contentions. First, he seems to argue insufficient evidence supports the conclusion he was the person who "'hit up'" Jose. Second, Gomez claims he was not in F-Troop territory, he was not wearing F-Troop's color (brown), he was wearing a red sweatshirt over his Famous Stars and Straps T-shirt, his tattoo was

16

small and not mentioned by Jose, he did not claim F-Troop, and he did not brandish the guns as he walked through the neighborhood. As we explain above, there was sufficient evidence for the jury to reasonably conclude that when officers stopped Gomez he possessed the guns for the benefit of and with the specific intent to promote F-Troop without considering Jose's 911 call. Additionally, Gomez's reliance on evidence favorable to him and dismissal of damaging evidence is simply an invitation to reweigh the evidence and substitute our judgment for the jury's. That we cannot do. (*Albillar, supra,* 51 Cal.4th at pp. 59-60.)

Based on the entire record, the jury could reasonably conclude Gomez was a felon who possessed the firearms for the benefit of and with the specific intent to promote criminal conduct by gang members. Thus, there was sufficient evidence supporting the jury's verdicts Gomez committed counts 1 and 2 for the benefit of a criminal street gang.

## II. *Admissibility of Evidence*

Gomez argues the trial court erred in admitting evidence of Jose's 911 call because the statements were irrelevant, were inadmissible hearsay, and violated his Sixth Amendment confrontation rights. His claims are meritless.

### A. *Evidence Code section 1240*

Gomez argues Jose was not under stress or excitement during the 911 call. Relying on the fact the 911 call was with a second dispatcher after having spoke with a first dispatcher, he also contends Jose's statements were not made before he had time to contrive and misrepresent. Neither claim has merit.

Because Jose's statements were made out of court and admitted for their truth, they constituted hearsay. (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).) Evidence Code section 1240 however provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act,

17

condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." The theory underlying this exception is the declarant's lack of opportunity for reflection and deliberate fabrication supply an adequate assurance of the statement's trustworthiness. (*People v. Clark* (2011) 52 Cal.4th 856, 925 (*Clark*).)

For admission of a spontaneous statement, "'(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.' [Citations.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*).) For purposes of this exception to the hearsay rule, spontaneous means the statement is made without reflection. "'"Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity *if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance*." [Citation.]' [Citation.]" (*People v. Thomas* (2011) 51 Cal.4th 449, 495-496.)

"Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact. [Citation.] The determination of the question is vested in the court, not the jury. [Citation.] In performing this task, the court 'necessarily [exercises] some element of discretion . . . .' [Citation.]" (*Poggi, supra,* 45 Cal.3d at p. 318.) The preliminary facts that bring statements within the exception require only proof by a preponderance of the evidence. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 966.) "[W]e will uphold the trial court's determination if it is supported by substantial evidence. [Citation.] We review for abuse of discretion the ultimate decision whether to admit the evidence. [Citations.]" (*People v. Phillips* (2000) 22 Cal.4th 226, 236.) "Because the second requirement [viz., that the

18

utterance must have been made before there has been time to contrive and misrepresent] relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met [citation]." (*Poggi, supra,* 45 Cal.3d at pp. 318-319.)

Evidence Code section 352 authorizes a trial court to exclude relevant evidence if its probative value is substantially outweighed by undue prejudice. We review a trial court's evidentiary rulings for an abuse of discretion. (*People v. Davis* (2009) 46 Cal.4th 539, 602.)

Here, when Jose walked out of his home to go to work that morning, a man armed with two guns "hit him up" and tried to rob him. A complete reading of the transcript shows Jose was emotional and distressed when he spoke with the 911 dispatcher. Jose stuttered throughout the call and was at times inaudible. Jose twice told the dispatcher he was concerned because the man was armed and he wanted police to arrest him. Jose also said he was afraid because the man appeared to know the area well and had seen Jose. Jose was afraid for his family's safety and had problems in the neighborhood before. At one point, Jose asked the dispatcher, "[D]o you guys really take this long . . . ?" Under these circumstances, we cannot say the trial court erred in determining Jose made his statements concerning the confrontation and its aftermath while still under the influence of nervous excitement caused by the event so that his utterances were spontaneous and unreflecting.

Neither the fact Jose's declarations were elicited by questions (*Poggi, supra,* 45 Cal.3d at p. 319 [fact statements in response to questions does not deprive statements of spontaneity if made under nervous excitement and without reflection]), nor the fact he was driving alter our conclusion (*People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1589 [that declarant may have "had the wherewithal to drive herself and her child to the police station in order to make her escape" from defendant's domestic assault did not mean statements at police station lacked spontaneity as being made after opportunity

19

to deliberate and reflect]).  Additionally, that Jose spoke with a first dispatcher before being transferred to a second dispatcher does not compel a different result.  "'The amount of time that passes between a startling event and subsequent declaration is not dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited.'  [Citations.]"  (*Clark, supra,* 52 Cal.4th at p. 926.)  Gomez does not claim, and the record does not support, the conclusion a significant amount of time passed between the incident and the 911 call.  Jose's description of the events in the present tense support the inference he called 911 immediately and there was no time to contrive and misrepresent.

Finally, the trial court's ruling the 911 call was admissible under Evidence Code section 352 was not an abuse of discretion.  The trial court opined Jose's statements were relevant to the gang enhancement because it was a traditional gang "hit[-]up."  Although Gomez strongly disputes the *weight* of that evidence as it relates to the gang enhancement, he does not dispute its *admissibility* as to that issue.  Recognizing we give great deference to a trial court's evidentiary rulings, evidence of Jose's 911 call could be classified as character evidence prohibited by Evidence Code section 1101, subdivision (a).

Gomez was not prosecuted for the incident with Jose.  He was prosecuted for possessing guns and methamphetamine police later found on him.  And it was alleged Gomez possessed the guns for the benefit of and with the specific intent to benefit F-Troop.  The admission of the 911 call allowed the jury to infer Gomez previously engaged in a gang "hit up" and attempted to rob Jose to prove he *later* possessed guns for the benefit of and with the specific intent to promote F-Troop.  Although officers detained Gomez about 10 minutes after the incident, admission of the 911 call permitted the jury to infer Gomez engaged in prior bad conduct to prove the gang enhancement.  Additionally, the relevance of that evidence was diminished by the fact Jose did not testify and identify Gomez as the assailant.  But because of the strong similarities

20

between Jose's description of the perpetrator and Gomez's physical features and clothing, there was sufficient evidence to submit the issue to the jury. (*People v. Blacksher* (2011) 52 Cal.4th 769, 811 (*Blacksher*) [issue of declarant's observations went to weight of her statements not their admissibility].) Thus, we cannot say the trial court erred in concluding the 911 call's prejudicial effect did not substantially outweigh its probative value. Therefore, the court did not err in admitting evidence of Jose's 911 call pursuant to Evidence Code section 1240.

*B. Confrontation Clause*

In *Crawford, supra,* 541 U.S. 36, the United States Supreme Court reexamined the application of the Sixth Amendment to the admission of hearsay statements. *Crawford* established, except in circumstances not relevant here, if a hearsay statement is testimonial in nature it cannot be introduced against a criminal defendant unless the declarant is unavailable, and the defendant had a previous opportunity to cross-examine the declarant. (*Crawford, supra,* 541 U.S. at pp. 53-54.) The *Crawford* court did not give a comprehensive definition of the term "testimonial" and subsequent cases have addressed how the rule should be applied.

In *Davis v. Washington* (2006) 547 U.S. 813, 821-824 (*Davis*), the Supreme Court consolidated two domestic violence cases—*Davis v. Washington* and *Hammon v. Indiana* (*Hammon*)—and defined the contours of the confrontation clause in emergency situations. In *Davis*, the victim called 911 as she was being attacked by her assailant, and in response to questions by the 911 operator, said the assailant was "jumpin' on" her and he was using his fists and had no weapons. (*Davis, supra,* 547 U.S. at p. 817.) The Supreme Court concluded the circumstances of the 911 operator's questioning "objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." (*Id.* at p. 828.) The Court stated the victim was not "acting as a witness" or "testifying," and that "[w]hat she said was not 'a weaker substitute for live testimony' at trial . . . ." (*Ibid.*, italics omitted.)

21

In *Hammon*, police responded to a domestic disturbance call at a home, and the victim was alone on the front porch when the two officers arrived. She appeared somewhat frightened but said """"nothing was the matter."""" (*Davis, supra,* 547 U.S. at p. 819.) Inside the house, defendant told the officers that he and the victim had been arguing but that it never became physical. (*Ibid*.) While one officer remained with defendant, the other spoke to the victim in another room. (*Ibid*.) There, the victim told the officer defendant broke the phone, lamp, and heater, and he threw her down into the glass of the heater and punched her in the chest. (*Id.* at p. 820.) The Supreme Court concluded, "There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing . . . ." (*Id.* at p. 829.) The Court concluded, "Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer should have done." (*Id.* at p. 830, italics omitted.) The Court held the statements were therefore inadmissible under *Crawford*. (*Davis, supra,* 547 U.S. at p. 829.)

The issue again was revisited by the Supreme Court in *Michigan v. Bryant* (2011) 562 U.S. ___ [131 S.Ct. 1143] (*Bryant*). A jury convicted defendant of shooting the victim. Police responded to the location of the victim and discovered he had been shot in the abdomen. The victim told officers he had been at defendant's home and had been shot through the back door. After being shot, he got in his car and drove to a gas station where officers found him. (*Id.* at p. ___ [131 S.Ct. at p. 1150].) Applying the test in *Davis*, the Supreme Court concluded the statements were not testimonial because an objective view of the totality of the circumstances established the primary purpose of the interrogation was to respond to an ongoing emergency. (*Bryant, supra,* 562 U.S. ___ [131 S.Ct. at pp. 1162-1167].)

The California Supreme Court summarized *Crawford*, *Davis*, and *Bryant* in *Blacksher, supra,* 52 Cal.4th 769. The *Blacksher* court opined *Crawford* "added a second

22

layer of inquiry when hearsay is offered against a criminal defendant." (*Blacksher, supra,* 52 Cal.4th at p. 811.)  It explained:  "It is the 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause. [Citation.]  Consequently, if a statement is not offered for its truth, or is nontestimonial in character, the confrontation clause is not a bar to admission.  Thus, the touchstone questions are whether a statement is hearsay offered against a criminal defendant, whether the statement is otherwise admissible under a hearsay exception, and, if so, whether the statement is testimonial." (*Id.* at p. 813.)  The California Supreme Court also identified six factors to be considered when determining whether the primary purpose of both the declarant and the investigating officer was to create an out-of-court substitute for trial testimony:  (1) the circumstances of the encounter, (2) whether an ongoing emergency existed, although the lack of an emergency does not necessarily make a statement testimonial, (3) the circumstances of the emergency, if one existed, (4) the medical condition of the declarant, (5) the status of the emergency when the statement was obtained, and (6) the informality of the statement and the circumstances of its acquisition.  (*Id.* at pp. 814-815.)

The *Blacksher* court applied these factors to evaluate statements made to police officers.  The declarant spoke to officers at her house, where her daughter and grandson had been shot.  She told officers defendant, her son, had shot the victims.  The responding officer spoke with the declarant for approximately 15 minutes.  The officer asked questions about the shooting, including questions related to defendant's current location.  The officer learned defendant was not at the house so the officers suspected the shooter had fled.  It also was reasonable to presume defendant was armed with the firearm used in the murders.  The court observed the declarant was visibly upset, and the interview occurred in the front yard of declarant's home, with a neighbor present, under chaotic conditions.  (*Blacksher, supra,* 52 Cal.4th at pp. 816-817.)  The Supreme Court

23

concluded it was objectively reasonable for the officers to believe an armed perpetrator remained at large and presented an emergency situation. (*Id.* at p. 816.)

Applying the *Blacksher* factors to Jose's 911 call, we conclude an objective view of the totality of the circumstances established the primary purpose of Jose's statements was to respond to an ongoing emergency. As Jose left his home that morning to go to work, a man "hit [him] up" and attempted to rob him armed with two guns. After the man fled, Jose called 911 and spoke with a dispatcher. As Jose drove to work, he detailed what had happened, gave a physical description of the man and what he was wearing, and in which direction he was walking. Jose said "I . . . just want to make sure he doesn't hurt anybody." Jose provided the dispatcher with the circumstances of the confrontation and that the man was walking down the street during morning rush hour in a well traveled area armed with two guns. There was no formality to the statements as they occurred during a rapid and fluid call where Jose was describing what happened as he observed it. Like *Blacksher*, we conclude Jose's statements were not testimonial because he described an ongoing emergency.

Gomez argues there was no ongoing emergency because Jose was not injured and he was no longer in danger. He also asserts Jose's statements were testimonial because the dispatcher intended to obtain evidence from Jose and encouraged him to provide his name and meet with police to prosecute the man for the attempted robbery. As we explain above, there was an ongoing emergency that endangered the public at large. A man armed with two guns walked down a busy street where he could encounter people going to work and children going to school.

Additionally, Gomez's focus on the end of the call misses the mark. It is true non-testimonial statements addressing an emergency may convert subsequent statements into testimonial statements. (*Blacksher, supra,* 52 Cal.4th at p. 814.) However, "The inquiry is on the *primary* purpose of both the officer and declarant." (*Ibid.*) Based on a complete reading of the transcript, we conclude the primary purpose

24

was to neutralize an ongoing emergency. Far from having a testimonial purpose, Jose was determined not to get involved. Thus, we conclude the trial court properly ruled admission of the 911 call evidence did not violate Gomez's confrontation clause rights.

*C. Prejudice*

Assuming for the sake of argument there was error, either because Jose's statements were not spontaneous or they were testimonial, we conclude Gomez was not prejudiced even under the more onerous federal harmless error standard of review.

"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 . . . . [Citation.] 'Since *Chapman*, we have repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' The harmless error inquiry asks: 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 608, overruled on another ground in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.) It is undisputed Gomez was a convicted felon who possessed two loaded guns and methamphetamine. And as we explain above more fully, there was sufficient evidence without considering the circumstances of the Jose encounter to conclude Gomez possessed the guns for the benefit of and with the specific intent to promote F-Troop.

*III. Pitchess Motion*

Relying on the fact Orozco and Partida arrested him and Partida was present from the time of arrest through his interview at the police station, Gomez argues the trial court erred in denying his *Pitchess* motion as to Partida. Not so.

"To determine whether the defendant has established good cause for in-chambers review of an officer's personnel records, the trial court looks to whether the defendant has established the materiality of the requested information to the pending litigation . . . ." (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1026 (*Warrick* ).)

25

Accordingly, the court is to ask whether defense counsel's affidavit "adequately responds" to the following questions:  "Has the defense shown a logical connection between the charges and the proposed defense?  Is the defense request for *Pitchess* discovery *factually specific and tailored* to support its claim of officer misconduct?  Will the requested *Pitchess* discovery support the proposed defense, or is it likely to lead to information that would support the proposed defense?  Under what theory would the requested information be admissible at trial? . . ."  (*Warrick, supra,* 35 Cal.4th at pp. 1026-1027, italics added.)  We review the trial court's ruling on a *Pitchess* motion for an abuse of discretion.  (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992.)

Here, Gomez has not demonstrated the trial court abused its discretion in denying his *Pitchess* motion as to Partida.  After reviewing Gomez's moving papers, the trial court indicated the motion was too general and too broad and it was inclined to deny the motion.  The court went so far as to provide Gomez with the opportunity to refile the motion and provided defense counsel with guidance on how to tailor the motion.  Despite the court's preference for strictly following the *Pitchess* guidelines, the court indicated it could handle the matter informally and modify the motion to apply only to Orozco.  Gomez did not object.  The court stated it would not review Partida's personnel file in camera because Partida did not prepare the police report.  We cannot conclude the court abused its discretion in denying Gomez's *Pitchess* motion as to Partida after it went to great pains to assist Gomez.  Moreover, Gomez's silence at the hearing was an implicit agreement to informally modify his motion.

Gomez also invites this court to independently review the records Judge Briseno reviewed.  Gomez filed a motion to augment the appellate record to include copies of the materials reviewed by Judge Briseno during the course of its in camera review.  The law does not require this.

The trial court can make a record for appellate review by either describing the documents it reviews or ordering them photocopied.  (*People v. Mooc* (2001)

26 Cal.4th 1216, 1229-1230.)  Here, the trial court described the documents it reviewed and made an adequate record.  Based upon our review of the record, we conclude the trial court's orders concerning the disclosure of *Pitchess* materials were correct.  Gomez's motion to augment is denied.

## DISPOSITION

Gomez's motion to augment is denied.  The judgment is affirmed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


THOMPSON, J.

27